UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 12 CR 395 |
| v. | ) | Hon. Robert W. Gettleman |
| | ) | |
| BRIAN JAMES MOUDRY | ) | |

**GOVERNMENT'S POSITION PAPER ON SENTENCING**

At approximately 4:00 a.m., on June 17, 2007, in Joliet, Brian James Moudry, defendant, an admitted white supremacist set a residence located a few houses down from his own on fire.[1] At the time of the fire, the house was occupied by one adult and eight children–ranging from four to fourteen years of age. Defendant, motivated by hatred, set the house on fire because it was occupied by African Americans. Thankfully, Victim A, a minor child, who lived in the residence, observed the fire soon after it was started, woke her mother and the fire was extinguished by a police officer responding to the 911 call before anyone inside the residence sustained injuries.

As a result of his conduct, defendant was charged in a three-count indictment. On January 18, 2013, defendant Moudry pled guilty to Count Two of the Indictment which charged defendant with the use of fire in the interference of another occupying a dwelling because of the occupant's race, in violation of Title 42, United States Code, Section 3631(a).

---

[1]Moudry's membership in white supremacist groups is documented, in part, by his own admissions as well as photographs recovered from his house and taken of his residence, attached as Exhibit A.

Based on defendant's conduct and for the reasons spelled out in this Position Paper, the government requests that this Court impose a sentence of 10 years' imprisonment – the Guideline range applicable in this case and the maximum possible penalty for this offense. Further, the terms of the plea agreement entered into between the parties is governed, in part, by Rule 11(c)(1)(C). Pursuant to the terms of the plea agreement, the parties have agreed that the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of Prisons of 120 months.

## I. FACTUAL BACKGROUND

The government has set forth its version of the offense, which was adopted in summary fashion in the PSR, and which is supported by the following evidence: (1) under oath testimony, (2) witness statements documented in FBI 302s, (3) reports from the Joliet Police Department, (4) photographs and (5) defendant's written plea agreement. The government will first set forth defendant's criminal conduct and will then address the Guidelines calculations.

In approximately May 2007, an African-American family moved into a rental home down the street from the defendant's residence in Joliet. PSR, ¶ 7. Defendant was bothered by the children "hanging out" on the front porch and referred to them as "niggers." PSR, ¶ 7. Defendant routinely threatened that he was going to burn their house down. See Govt. Version, Exhibit B, page 9.

On June 17, 2007, at approximately 4 a.m., the defendant used gasoline to set fire to the residence. PSR, ¶ 8. Specifically, defendant poured gasoline on an area of the south side of the home and ignited the fire. When defendant returned to his

residence, he bragged, "I did it, I did it, I set that fucking house on fire." Govt. Version, Exhibit B, page 14. Defendant subsequently realized that the fire he set had extinguished. He returned to the residence, poured more gasoline on a north-facing exterior wall of the residence and ignited a second fire. PSR, ¶ 8.

While there, a 14-year-old girl who lived in the home observed the fire and went outside the residence to investigate. PSR, ¶ 9. The girl saw the defendant holding a red can near the corner of the house. *Id.* The defendant fled past the girl and returned to his home. *Id.* The girl woke her mother, who called 911, and the family (safely) evacuated the residence.

After igniting the second fire, defendant returned home briefly. At gunpoint, Witness A drove defendant from the residence to another area of Joliet. Govt. Version, Exhibit B, page 15. Defendant then took numerous actions to destroy evidence from the arson, including disposing of the gas can, his clothing and cleaning the vehicle in which he and Witness A rode. PSR, ¶ 10. Defendant further attempted to provide an alibi for himself by purchasing food with a credit card at a Dunkin Donuts. PSR, ¶ 10 and Govt. Version, Exhibit B, page 17.

On June 17, 2007, after defendant fled the area, the Joliet Police Department arrested one of defendant's friends, who was sleeping inside defendant's garage. Initially, the friend was charged by criminal complaint with one count of aggravated arson and one count of residential arson. He was subsequently charged with nine counts of aggravated and residential arson. Ultimately, the Will County States

Attorney's Office dismissed the charges against the friend on March 10, 2008. *See* Govt. Version, Exhibits C, D and E.

## II. GUIDELINE CALCULATIONS

The Probation Department found that defendant had a total offense level of 35. The government generally agrees with the Probation Officer's calculation of the guideline range as set forth below.[2]

| | |
|---|---|
| base offense level, 2H1.1(a)(1) and 2A2.1(a)(1) | 33 |
| victim/property selected because of race, 3A1.1(a) | +3 |
| victim was a vulnerable victim, 3A1.1(b)(1) | +2 |
| acceptance of responsibility | -2 |
| timely notification of intent to enter a guilty plea | -1 |

Per the terms of the written plea agreement, defendant has reserved the right to object to the application of each of these Guideline sections. Accordingly, the government has set forth its positions, as well as the supporting evidence and law, below.

### A. The base offense level is 33, pursuant to Guideline §§ 2H1.1(a)(1) and 2A2.1(a)(1), because the object of the offense would have constituted first degree murder.

The proper base offense level is 33 because the object of the offense would have constituted first degree murder. Guidelines § 2A2.1, Note 1, provides "first degree

[2] As set forth in the plea agreement, defendant has reserved the right to contest the application of certain sentencing Guidelines. In light of defendant's position, the government has reserved the right to take whatever position it deems appropriate at the time of sentencing with respect to whether defendant has accepted responsibility within the meaning of Guideline § 3E1.1(a). Without knowing the nature of defendant's objections, if any, the government does not object to the proposed reduction for acceptance of responsibility contemplated by the Probation Officer at this time.

murder" means conduct that, if committed within the territorial jurisdiction of the United States, could constitute first degree murder under 18 U.S.C. § 1111. Title 18, United States Code, Section 1111(a) provides, in relevant part,

> [m]urder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson...is murder in the first degree.

For the cross-reference to apply, a preponderance of the evidence must show that defendant intended to cause death when he set the fire. It is entirely appropriate for the court to rely on circumstantial evidence to make the reasonable inference, by a preponderance of the evidence, that the defendant intended to cause death. *See United States v. Perez*, -- F.3d --, 2010 WL 2652464, at *7 (7th Cir. July 6, 2010) (intent may be proved by circumstantial evidence); *United States v. Are*, 590 F.3d 499, 517 (7th Cir. 2009) (at sentencing, government must only present enough evidence allowing reasonable inferences to constitute a preponderance supporting its position); *United States v. Morrison*, 207 F.3d 962, 966 (7th Cir. 2000) ("Crimes may be proved entirely by circumstantial evidence."); *United States v. White*, 00-5759, 2001 WL 1631439, at *2 (6th Cir. Dec. 18, 2001) (finding that U.S.S.G. § 2A2.1(a)(1) applied because defendant's actions in obtaining his gun from the trunk of his car and waiting for security guards to leave the nightclub were wilful, deliberate, malicious and premeditated and presumably would have resulted in the murder of the security guards if the police had not intervened).

Here, defendant's actions demonstrate by a preponderance of the evidence that defendant set the fire with the intent to cause death. As a preliminary matter, the arson occurred at 4:00 a.m. when Victim B and her family were at home and likely sleeping thereby making it less likely that they would escape the burning residence. He also knew that, in the middle of the night, other residents of the neighborhood would similarly be sleeping making it less likely that someone would observe the fire and seek emergency assistance. Defendant specifically used a container of gasoline-a powerful accelerant. Defendant initially splashed the south side of the residence with gasoline and set it on fire. After returning to his residence, defendant realized that the fire had extinguished. Defendant's actions at this point are especially telling as he returned to the residence a second time. Again, defendant carried a container of gasoline with him, this time splashed the accelerant on the north side of the residence and ignited it. Defendant's actions when he set the residence on fire a second time made clear that he meant to succeed in his efforts to burn down the residence and intended to cause the deaths of its inhabitants-whom he presumed to be sleeping.

The Seventh Circuit's opinion in *United States v. Polanco,* Nos. 10-3362, 10-3374, 2012 WL 3711875, at * 3-4, 6 (7th Cir. August 29, 2012), is instructive on this point. The defendants in *Polanco* both pled guilty to arson, in violation of Title 18, United States Code, Section 844(i). The government argued that the attempted-murder guideline was applicable since the defendant's objective was to kill someone. More specifically, the government argued that the cross reference to the attempted-murder guidelines should apply because the defendants' intent to kill could be inferred

from their actions: they used gasoline, a powerful accelerant to set fire to a building they knew to be occupied and further knew might be occupied by children, and they certainly knew that fire was very destructive. *See Polanco,* at 3. Both the probation officer and court rejected the government's position. On appeal, the Seventh Circuit noted as follows:

> ...and [the district court's] only mistake was one that benefitted defendants: not applying the attempted murder cross-reference. The judge said that there was no evidence of an intent to kill, but we agree with the government that the defendants' intent to kill could be inferred from their actions, *see United States v. Peugh*, 675 F.3d 736, 741 (7th Cir. 2012); *United States v. Perez*, 612 F.3d 879, 887 (7th Cir. 2010), particularly considering that a preponderance of the evidence is normally sufficient at sentencing, *see United States v. Mitchell*, 635 F.3d 990, 992-93 (7th Cir. 2011).

Based on the evidence described above, and the Seventh Circuit's opinion in *Polanco*, the only reasonable inference here is that defendant intended to kill Victim B and her children when he twice set fire to their residence which he correctly believed was occupied. Further, Witness A, testified that defendant repeatedly threatened to burn the house down before making good on this threats. Defendant's actions were wilful, deliberate, malicious and premeditated, and they may have resulted in the murder of the occupants of the residence if one of the children had not been awake, notified her mother of the flames, and thwarted defendant's continued efforts to splash gasoline on the residence. Defendant only stopped when he realized he had been observed.

For these reasons, defendant's base offense level is 33, pursuant to Guideline § 2A2.1(a)(1), because the object of the offense would have constituted first degree murder.

**B. Pursuant to Guideline § 3A1.1(a), the offense level is increased 3 levels because defendant selected the property for the offense because it was occupied by an African American family.**

Defendant, by his own admission of guilt, and as set forth on pages two and three of the plea agreement, was upset when, in May 2007, an African American family moved into his neighborhood. Specifically, the family moved several houses down from defendant on the same street on which he resided. As defendant admitted, he set the fire at the residence because African Americans were renting the residence, and defendant intended to interfere with their continued ability to rent the residence and to intimidate the owner of the residence from continuing to rent to African Americans. Based on defendant's guilty plea alone to this offense, this enhancement applies.

**C. The offense level is increased 2 levels because the defendant knew that the victims of the offense were vulnerable, namely minor children.**

Defendant was well aware of the family, including the children, who resided in the residence where he set the fire. Indeed, he was disturbed by the family having merely moved into the residence less than a month earlier. According to the testimony of Witness A, on the night of the arson, defendant stated "that he should go burn down the house that the African American family was living in and referred to them as niggers." Witness A further testified that "I later read in the newspaper that nine children were in the house when Brian set fire to it. This made me sick to my stomach

but Brian did not seem to care. He showed no remorse about the children being in the house," Govt. Version, Exhibit B, pages 21-22. Indeed, defendant was well aware that children were in the residence at the time of the arson.

Guidelines § 3A1.1(b)(1) provides for a two-level increase if the defendant knew or should have known that a victim of the offense was a vulnerable victim. Per Application Note 2, a "vulnerable victim" is a person (A) who is a victim of the offense of conviction; and (B) who is unusually vulnerable due to **age**, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct (emphasis added). As previously stated, there were eight children inside the residence at the time of the arson. According to the report from the Joliet Police Department, *see* Govt. Version, Exhibit G, the children's ages ranged from four to fourteen years of age. The victims' ages alone are sufficient to establish the application of this enhancement. *See United States v. Sims*, 329 F.3d 937, 944 (7th Cir. 2003)(No other factor need accompany age so long as the victim's vulnerability is related to the victim's age); *See, e.g., United States v. Pospisil,* 186 F.3d 1023, 1030 (8th Cir.1999) (affirming application of § 3A1.1 (b)(1) in cross burning case where victims – a mother and her children – were new in town and children were young in age).

In addition to being vulnerable because of their age, the children and the adult inside were vulnerable because of their physical condition, namely, they were asleep at the time of the arson, which occurred at 4:00 in the morning. Given the time of day the defendant lit the fires, it was far less likely that the fires would be observed by someone inside or outside of the residence and that the occupants would safely escape.

The age of the victims, coupled with the fact that they were asleep, warrant the applicability of this enhancement.

**D. Summary**

Based on the calculations of the Probation Officer, defendant has a total adjusted offense level of no less than 35. Defendant's criminal history is category III because of multiple prior convictions, including a 1999 Hate Crime conviction. Based upon a total offense level of 35 and a criminal history category of III, the guideline imprisonment range is 210 months to 262 months. However, as the statutorily authorized maximum sentence of ten years is less than the minimum of the applicable guideline range, the guideline term of imprisonment is 120 months. *See* USSG § 5G1.1(a).[2]

## III. RESTITUTION

As set forth in the plea agreement and PSR, restitution in an amount to be determined by the Court at the time of sentencing shall be ordered. The government respectfully requests this Court to order restitution in the amount of no less than $5,951.05 to be paid to various individuals and/or entities.[3]

---

[2]Defendant's guideline range does not change even if the Court were to find that defendant is not entitled to a reduction in offense level based on acceptance of responsibility.

[3]The government is currently awaiting additional receipts from victims of the offense relating to costs incurred stemming from the arson. Upon receipt, the government will supplement this filing to reflect the additional loss directly related to the arson in order to be included in the order of restitution.

The Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A, requires the sentencing court, "in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense," to order the defendant to return the property to the owner or, if that is infeasible, to pay the owner an amount equal to the loss of the value of the property." The MVRA's overriding purpose is "to compensate victims for their losses." Here, the landlord of the rental property was required to pay a $500 deductible before Country Casualty, his insurance company, would pay for the damage, and necessary repairs, to the residence following the arson. *See* Exhibit B. Country Casualty subsequently paid $ $5,451.05 to repair the physical damage to the residence following the arson. *See* Exhibit B. Defendant is, of course, responsible to pay restitution for the direct costs stemming from his criminal conduct.

Further,Victim B is entitled to restitution for the moving costs she incurred as a result of having to uproot herself and her family to a safer environment. Indeed, Victim B left the Joliet, Illinois area immediately following the arson and relocated her family. Such expenses are included in the restitution order as they constitute a form of damage to the property and were a direct result of defendant's crime. *See United States v. Robers*, 698 F.3d 937, 955 (7th Cir. 2011) (Loss in value of the real estate and the various line-item expenses incurred by mortgage fraud victims while attempting to convert the collateral back to cash were directly caused by defendant's fraud and constituted recoverable damages to their property under MVRA). *See United States v. Scott*, 405 F.3d 615, 619 (7th Cir. 2005) (In prosecution for bank fraud, banks/victims' audit expenses, incurred in effort to determine how much money had

been stolen from them, were awardable as restitution under MVRA; expenses constituted form of damage to banks' property); *see also United States v. Havens*, 424 F.3d 535, 539 (7th Cir. 2005) (Defendant convicted of identity theft was required to pay restitution to victim whose identifying information she stole for diminution in value of victim's property caused by defendant's conduct, and for time victim spent dealing with banks and credit agencies in effort to correct her credit history and repair damage to her credit rating). *United States v. Menza*, 137 F.3d 533, 539 (7th Cir. 1998) (clean-up costs required by the defendants' conduct are recoverable). The relocation expenses incurred by Victim B were directly caused by defendant's crime and constitute recoverable damages to her property.

## IV. 3553(a) FACTORS JUSTIFY A VERY SIGNIFICANT SENTENCE.

### *A. The Nature and Circumstances of the Offense*

This was an exceptionally despicable crime motivated by hate. The victims of the arson did nothing, but move into a new residence in Joliet. Unbeknownst to the victims, several houses down lived a white supremacist who never knew the victims but hated them because they were African American. But for a child inside the residence being awake at the time of the arson, the consequences of defendant's actions could have been far worse, indeed, deadly. Moudry's actions were hateful and potentially lethal. For any person–let alone young children- to be exposed to such violence and hatred, simply because of the color of their skin, is horribly tragic and disturbing.

Fortunately, the occupants of the residence–one adult and eight children-escaped physically unharmed. Undoubtedly, they will forever be impacted by the memory of being woken up in the middle of the night to the fear and panic of having to escape a burning residence. Adding to this horrifying ordeal is the knowledge that the fire was not an accident, but was deliberately set by defendant, who intended to do his victims harm. One can only imagine the psychological terror inflicted on the victims as a result of defendant's senseless crime. It is impossible to sufficiently understand the fear that went through Victim B, the sole adult present and responsible for waking the children and safely removing them from the burning residence. It is also impossible to imagine the thoughts that go through a victim's mind when they re-live the events which occurred on June 17, 2007 and think about what could have happened.

***B. History and Characteristics of Defendant***

Defendant has long espoused and expressed white supremacist views. This is well-documented and illustrated by photographs of defendant's garage and tattoos, attached as Exhibits A and C. Defendant has also demonstrated a long history of engaging in violent and threatening conduct directed towards individuals of other races. For example, in 1999, defendant was convicted of a hate crime in the Circuit Court of Will County. As set forth in the PSR, officers responded to a Burger King. The victims of the offense were in line at the food counter when passengers in a vehicle at the drive-up window began yelling racial slurs at the victims and told the victims to meet them in front of the restaurant. The vehicle subsequently pulled in front of the

restaurant's entrance and a passenger in the vehicle, later determined to be the defendant, produced what the victims and witnesses believed to be a gun.[4] Defendant and the other passengers yelled racial slurs at the victims and threatened them. The victims feared for their lives if they left the restaurant.

Defendant's encounters with the criminal justice system related to his attacks (oral and physical, as well as the threat of physical assaults) continued through the years. More recently, in 2011, defendant pled guilty to disorderly conduct. This conviction stems from officers responding to a call that defendant was brandishing a firearm[5] and yelling racial slurs at passing individuals. When officers arrived at the scene, defendant entered his home, shut the windows and doors, and continued to yell "White Power" and other racial slurs.

Defendant's actions demonstrate a long history of terrorizing individuals, and placing them in fear of their lives, simply based on their race. Further, through the crimes he has committed, defendant has demonstrated an unwillingness to adhere his conduct to the laws of society.

**C. *The Need for the Sentence Imposed***

The sentence imposed needs to be significant to reflect the seriousness of this crime, provide just punishment for it, and to deter defendant from committing other

---

[4]Defendant reportedly told police officers that he was the passenger who exhibited the weapon, which was a paint brush handle painted with white supremacist markings.

[5]Officers subsequently recovered a pellet gun.

crimes. As noted above, defendant has long engaged in acts in which he threatens violence or commits acts of violence against individuals based on their race. Defendant has repeatedly, for a span of more than a decade, terrorized and victimized innocent people. There are real consequences to the violence and threats perpetrated by the defendant–both for his victims and for society. Defendant's sentence should reflect that.

This Court should also protect the public from further crimes of defendant. As already noted, defendant has demonstrated a pattern of acting in a violent and aggressive manner towards individuals because their race differs from the defendant. Despite defendant's encounters with law enforcement, he has been undeterred from this conduct. The Court's sentence must send a clear message to defendant that such violence is unacceptable and will not be tolerated. A significant sentence of incarceration will also protect individuals, like Victims A and B, from the defendant's violent conduct. Indeed, based on defendant's pattern of conduct, it appears that a significant period of incarceration is the best way to prevent defendant from further acts of violence.

A ten-year sentence, the maximum possible sentence, will also act as general deterrence, sending a message to others that if you intimidate and threaten others based on their race, and interfere with their housing rights, then you forfeit your right to live in a free society.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court impose the maximum possible penalty–a sentence of 10 years' imprisonment.

Respectfully submitted,

GARY S. SHAPIRO
United States Attorney

By: s/ Nancy DePodesta
NANCY DEPODESTA
STEVEN J. DOLLEAR
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-4224

Dated: April 17, 2013